IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SID TILSTRA and
TILSTRA DAIRY EQUIPMENT, LTD.,

          Plaintiffs,

   v.

BOU-MATIC, LLC,

          Defendant.

OPINION AND ORDER

12-cv-827-slc

---

In this civil action for monetary relief, plaintiffs Sid Tilstra and his company, Tilstra Dairy Equipment, Ltd. (collectively "Tilstra") contend that in early 2010, defendant Bou-Matic, LLC breached Bou-Matic's dealership agreement with Tilstra to sell dairy equipment when Bou-Matic threatened to reassign Tilstra's territory and tortiously interfered with Tilstra's sale of its dealership to a neighboring Bou-Matic dealer. Jurisdiction is present under 28 U.S.C. § 1332.[1] Before the court is Bou-Matic's motion for summary judgment in which it argues that the tortious interference of contract claim is barred by Wis. Stat. § 893.57, the statute of limitations for intentional torts, and that Tilstra has not adduced sufficient evidence to prevail on his breach of contract claim. Dkt. 18.

I conclude that Bou-Matic is entitled to summary judgment on Tilstra's claim of tortious interference because it is barred by the statute of limitations for intentional torts and is not subject to statutory tolling. Bou-Matic is not entitled to summary judgement on Tilstra's breach of contract claim because a reasonable jury could find that Bou-Matic's decision to eliminate Tilstra's dealership territory was a breach of the implied covenant of good faith and fair dealing, or alternatively, constituted an anticipatory or constructive breach.

---

[1] *See* Tilstra's undisputed proposed findings of fact establishing the parties' diverse citizenship, dkt. 36 at 1-4.

For the purpose of deciding Bou-Matic's motion, I find the following facts to be material and undisputed:

## UNDISPUTED FACTS

### I. The Parties and Their Dealership Agreement

Plaintiff Sid Tilstra is a citizen of Ontario, Canada. He is the owner and president of plaintiff Tilstra Dairy Equipment Ltd., a dairy equipment dealership headquartered in Ontario. Defendant Bou-Matic LLC is a citizen of Texas with headquarters in Madison, Wisconsin. Bou-Matic manufactures dairy equipment and parts. Bou-Matic sells its equipment and parts through territorial dealers, who also service Bou-Matic products.

Tilstra became a Bou-Matic dealer in 1981 and operated in that capacity for almost 20 years, until March 2, 2010. The parties executed their last written dealership agreement in July 2004. The agreement named Sid Tilstra as the "dealer" and Tilstra Dairy Equipment, Ltd., as the "dealer business name." Although the agreement assigned to Tilstra an exclusive territory in which to sell and service Bou-Matic products, Bou-Matic reserved to itself the right to change Tilstra's assigned territory:

> Dealer shall purchase Bou-Matic products only on Dealer's own account for resale to purchaser-users in Dealer's assigned territory as described in the "Territory Addendum" to this agreement which is incorporated herein. Dealer shall solicit sales only in their assigned territory unless allowed by Bou-Matic in writing prior to any solicitation. Bou-Matic reserves the right to change, at its sole discretion, the assigned territory and amend the Territory Addendum.

> Agreement, dkt. 1, exh. A, at ¶ 3.

With respect to termination, the agreement provided that:

> Except as otherwise provided herein, Bou-Matic shall not terminate this Agreement or effect a substantial change in the competitive circumstances of this Agreement without good cause and only upon ninety (90) days' advance written notice sent by certified mail.  The term "good cause" means Dealer's failure to comply substantially with essential and reasonable requirements imposed upon Dealer by Bou-Matic.

> *Id.* at ¶ 14.

## II.  Tilstra's Contiguous Competitor: Dortmans Brothers Barn Equipment, Inc.

Dortmans Brothers Barn Equipment, Inc. (Dortmans) is a corporation owned by John and Rita Dortmans and Ben Willemse.  Dortmans became a Bou-Matic dealer in the early 1980s.  In 2009, Dortmans and Tilstra had adjacent Bou-Matic territories in southwestern Ontario, Canada.  The cow population in Tilstra's territory was almost twice that of Dortmans's territory.  Between July 2007 and 2010, John Ghey was the district sales manager for Bou-Matic in the territories assigned to Tilstra and Dortmans.  Ghey has known Willemse of Dortmans for 10 to 12 years.  Prior to joining Bou-Matic, Ghey had worked for Bou-Matic's competitor, DeLaval.  Dortmans also is a DeLaval dealer, and Ghey had provided technical assistance to Dortmans while he was at DeLaval.

In late 2006 or early 2007, John Dortmans approached Sid Tilstra about Dortmans buying Tilstra's Bou-Matic dealership.  Dortmans and Tilstra discussed and agreed on a formula under which Tilstra would be willing to sell to Dortmans.  The formula would have resulted in a sale price between $2,000,000 and $2,500,000.  However, after reviewing Tilstra's financials under the formula with his accountant, John Dortmans told Sid Tilstra that the purchase was more expensive than he had anticipated and he could not afford it.

### III.  Bou-Matic's Threats to Change Tilstra's Territory

In August 2008, Ghey and Willemse exchanged emails and had discussions about Dortmans needing more territory.  On September 9, 2009, Sid Tilstra sent an email to Ghey and several of his superiors at Bou-Matic, criticizing Ghey for allowing Dortmans to bid on a project in Tilstra's territory and causing the loss of the prospective customer to DeLaval.  Shortly after, Ghey began putting together information to build a case for changing Tilstra's territory.

In February 2009, Ghey reviewed Tilstra's performance and determined that the company needed improvement in many areas.  By the fall of 2009, Ghey was looking into why Bou-Matic was losing market share, losing projects and doing poorly in Tilstra's territory.  Willemse and Dortmans provided Ghey with a list of farms that allegedly had issues with Tilstra.

On October 19, 2009, Ghey emailed a report to his regional sales manager, Mario Gladu, in which Ghey highlighted problems in Tilstra's territory and explaining why changes were necessary.  Ghey recommended that Bou-Matic reassign Tilstra's territory to other Bou-Matic dealers, including Dortmans.  Ghey reported that Dortmans and "Advanced" (another Bou-Matic dealer in the area) were "actively pursuing leads in Tilstra's territory," and "[b]oth would love to have additional territory with our blessing."  It was Ghey's opinion that Sid Tilstra was destroying the territory and that his "focus was about making money on the initial sale":

> [He] did not always do the follow-up with dairymen that he had sold equipment to.  Part of the cost of installing product is ongoing to make sure it works right. There were situations where that wasn't happening, and that was getting out into the community.

> Ghey deposition, dkt. 17 at 117-18.

4

Ghey also felt that Tilstra's "route man was good at what he did and there's a certain element of service he did at his end, like maintenance, but some of the knowledge and service department capacity was not there to deal with customers' issues." *Id.* at 118.

Bou-Matic did not then–or at any time in 2009–notify Tilstra in writing or orally that Tilstra was in breach or otherwise was not fulfilling its obligations under its dealership agreement.  Bou-Matic did not give Tilstra any notice in 2009 that it was in default of its dealership by failing properly servicing farmers or otherwise failing in the territory.  Tilstra claims that prior to January 8, 2010, the dealership consistently increased sales in its territory[2] and turned a profit.

On October 26, 2009, Stephane Desjardins, who had replaced Gladu as regional sales manager for Tilstra's territory, sent an e-mail to Ghey stating:

> I have an idea to share with you. We approach Sid again and ask him to sell.  If he refuses or makes it too difficult, we would in the short term modify the territory lines in favor of Advanced and Dortmans.  This would become a concrete commitment to those dealers and put unbearable pressure on Sid — without cancelling him outright or immediately.

In November 2009, Ghey called Sid Tilstra to request a meeting and hinted strongly that he was going to be changing Tilstra's trade territory.  Ghey and Desjardins met with Sid Tilstra and his wife on November 16, 2009.  Ghey indicated that Bou-Matic had made higher-level marketing decisions to have larger dealers.  Desjardins announced that Bou-Matic was going to remove Tilstra's territory if Tilstra did not agree to sell its assets and dealership to the Dortmans by December 1, 2009.  Ghey and Desjardins gave Tilstra a deadline of January 1, 2010 for

---

[2] Bou-Matic objects that this statement lacks foundation but fails to explain its basis for this objection.

5

closing the sale or Ghey and Desjardins "would have to go back to Madison and find out how we can get a change pushed through."

Soon after the November 16, 2009 meeting, John Dortmans telephoned Sid Tilstra and told him that he was aware of the November 16, 2009 meeting between Tilstra and Bou-Matic. Dortmans told Tilstra that he was "supposed to call." The two men agreed to meet later that week.

Meanwhile, between November 16 and 23, 2009, Ghey already was discussing with Willemse at Dortmans the negotiation process and terms of the proposed sale. On December 8, 2009, Ghey and Desjardins met with Willemse and John and Rita Dortmans to discuss the negotiations between Tilstra and Dortmans. Desjardins drafted a summary of the meeting entitled "Tilstra Dairy Equipment Takeover by Dortman Borthers [*sic*]," in which he stated that benefits to Bou-Matic of the takeover would include "[e]limination of a dealer that is slowly but surely destroying a territory" and "[e]limination of potential litigation because the takeover will be amicable." On December 11, 2009, Ghey sent an email to Dortmans outlining financial incentives and product discounts that Bou-Matic was willing to give Dortmans for taking over the Tilstra territory.

John Dortmans and Sid Tilstra met several times in November and December, 2009. John Dortmans still considered Sid Tilstra's 2007 asking price too high, so he made a counterproposal. During this time, Sid Tilstra did not express any opinions to Dortmans about Bou-Matic or the position his dealership was in.[3]

---

[3] The parties dispute whether Sid Tilstra ever complained to Bou-Matic about its treatment of him or the dealership.

On December 21, 2009, Desjardins sent Dortmans and Willemse a draft of a letter that Bou-Matic intended to send Tilstra regarding its "inaction" in selling its dealership. The purpose of this letter to Tilstra was to "accelerate the process of the sale happening" and to put pressure on Tilstra "to get this done."

On January 7, 2010, Rita Dortmans emailed Desjardins and Willemse, stating that

> John is wondering if you could contact Sid and make sure he is aware of what Bou-Matic's intentions are for his company in the future . . . Also keep in touch as to what was presented to Sid on behalf of Bou-Matic termination of their contract with Tilstra Dairy. We still feel that Sid is not aware that is going to happen.

The next day, Desjardins sent the following email to Dan Bradbury[4] at Bou-Matic:

> Jon [Ghey] suggested you sign the Tilstra's letter to give it more political weight. Jon is right in saying that Sid Tilstra may feel that Jon and I are not really serious about this cancellation. Are you ok with this? I am waiting for comments from Rita Dortmans before sending anything out.

On January 8, 2010, Desjardins sent an email to Rita Dortmans (which he copied Ghey and Bradbury) instructing her to get commitments from Tilstra on the following issues: "a noncompete agreement for 5 years preferably 10"; hiring Tilstra's employees, stating that "Sid can't keep them under any circumstances"; and "the date of January 15th is now final otherwise BouMatic will proceed with cancellation procedures voiding your commitment."

That same day, January 8, 2010, Bradbury emailed and posted a letter to Sid Tilstra, stating:

> We met back in November 16, 2009 to inform you that BouMatic LLC decided to make distribution changes in South Western

---

[4] Bradbury became North American Director of Sales for Bou-Matic in October 2009 and was in charge of supervising all dealer sales and district sales managers.

> Ontario and have Dortmans Brothers take over the territory
> covered by your company. . . . We have to make you aware that
> our decision to change our distribution channel in South Western
> Ontario is not negotiable and that we will proceed with or without
> your cooperation.

> Dkt. 20, exh. 1.

Bradbury sent copies of this letter to John and Rita Dortmans, Ben Willemse, John Ghey, Gladu and Desjardins.  When Sid Tilstra received this letter, he believed that Bou-Matic was terminating his dealership.[5]  He responded to Bradbury by e-mail on January 11, 2010 and questioned Bou-Matic's actions and Tilstra's termination.  Bradbury responded the same day, stating only that he was glad Tilstra was moving forward with a sale agreement with Dortmans. Dkt. 20, Exh. 2.

## IV.  The Sale of Tilstra to Dortmans

John Dortmans did not change the terms of his offer to purchase Tilstra after the January 8, 2010 letter.  On January 11, 2010, Rita Dortmans sent an email to Desjardins and Bradbury, informing them that John Dortmans had spoken to Sid Tilstra, was sending Tilstra an adjusted proposal and had agreed to meet with Sid Tilstra on Wednesday, January 13, 2010.  Tilstra accepted Dortmans's offer in principle on January 13, 2010, but the offer was not to be considered final  until the parties' attorneys and accountants had reviewed it.  On January 15, 2010, Tilstra hired a lawyer, Greg Hedley, to negotiate the final terms of the sale.

---

[5] Based on contradictory interpretations of Sid Tilstra's deposition testimony, the parties dispute whether Tilstra believed on January 8, 2010 that Bou-Matic had taken away his business and territory.  Bou-Matic points out that Tilstra continued as a dealer through March 2010.

On February 17, 2010, Tilstra and Dortmans entered into a final written agreement for Tilstra to sell its dealership to Dortmans, who agreed to purchase the entire Tilstra business, including customer lists, customer contracts, inventory, equipment, business records, goodwill, name, distribution rights from Bou-Matic, regulatory licenses and trade secrets for $414,230 in cash. Tilstra also agreed to a five-year management consulting contract under which Dortmans would pay Tilstra a fee of $310,000 over five years. In the final sale agreement, Tilstra represented and warranted that there had been no changes to Tilstra's business since May 2009.

Sid Tilstra believed that if he did not sell to Dortmans, then his assets would be worth less due to the changes Bou-Matic was going to make to his territory. Attorney Hedley never contacted Bou-Matic on behalf of Tilstra. Tilstra carried on as a normal Bou-Matic dealer until March 2, 2010, when Dortmans's and Tilstra's lawyers completed the legal documents. Bou-Matic congratulated Tilstra on completing the sale with Dortmans. Tilstra sent a thank you email to various Bou-Matic employees, stating that "Bou-Matic was a blessing to us while we were a dealer."

Tilstra filed suit in Ontario on November 14, 2011, alleging breach of contract and intentional interference with economic relations with respect to the constructive termination of his Bou-Matic dealership and the negotiations with Dortmans. On May 21, 2013, after this action was commenced, the Canadian court entered an order dismissing Bou-Matic as a party on the ground of improper forum.

OPINION

## I.  Summary Judgment Standard

Summary judgment is proper where there is no showing of a genuine issue of material fact, and where the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56. "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'"  *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007) (quoting *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005)).  In determining whether a genuine issue of material facts exists, the court must construe all facts in favor of the nonmoving party.  *Squibb v. Memorial Medical Center*, 497 F.3d 775, 780 (7th Cir. 2007).  Even so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## II.  Tortious Interference with Contract (Sale of Dealership to Dortmans)

Citing recent decisions from the U.S. District Court for the Eastern District of Wisconsin and the Wisconsin Court of Appeals, Bou-Matic contends that Tilstra's claim for intentional interference with contract is barred by the statute of limitations for intentional torts, Wis. Stat. § 893.57.  *See In re Rinaldi*, 487 B.R. 516, 538 (Bankr. E.D. Wis. 2013); *Mirbeau of Geneva Lake, LLC v. City of Lake Geneva*, 746 F. Supp. 2d 1000, 1013-14 (E.D. Wis. 2010); *Stapel v. Stapel*, 2010 WI App 120, ¶ 34 n. 9, 2010 WL 2757237 (Ct. App. 2010).  The parties agree that Tilstra's interference claim accrued sometime in January or February of 2010.  *See* Pls' Resp. Br., dkt. 31 at 32.  At that time, § 893.57 (2007-2008 version) provided that "[a]n action to recover

damages for libel, slander, assault, battery, invasion of privacy, false imprisonment or other intentional tort to the person shall be commenced within 2 years after the cause of action accrues." (The limitations period became three years as of February 25, 2010.) Tilstra filed suit in this court on November 15, 2012, nine months after the two-year statute of limitations period had run.

Tilstra argues, however, that it is not § 893.57 but the six-year limitations period set forth in § 893.53 for personal injury that applies to claims of tortious interference with contract. Section 893.53 is the state's residual personal injury statute of limitations that applies unless another statute expressly prescribes a different period for bringing claims. In support of his argument, Tilstra relies on a 29-year-old decision from this court, *Elbe v. Wausau Hospital Center*, 606 F. Supp. 1491, 1503 (W.D. Wis. 1985), in which Judge Crabb applied § 893.53 to an interference with contract claim. However, at the time *Elbe* was decided, the "issue of which section [893.53 or 893.57] should apply [was] not clear." *Id.* Judge Crabb noted that

> Wrongful interference with a contract is not really an "intentional tort to the person" covered by Wis. Stats. § 893.57. Nor is plaintiff's action, as plaintiff has pointed out, an action "upon" a contract. In *Segall v. Hurwitz*, 114 Wis. 2d 471, 487–88, 339 N.W.2d 333, 341 (Ct. App. 1983), a Wisconsin court of appeals held that Wis. Stats. § 893.53 applies to interference with contract claims. In the absence of any clear indication that another statute of limitations would be preferable, I will follow the *Segall* decision.
>
> *Id.*

Although the Wisconsin court of appeals subsequently agreed with Judge Crabb in an unpublished decision issued five years later, *TSR, Inc. v. Niebling*, 144 Wis. 2d 949, 425 N.W.2d 39 (Ct. App. 1988), courts have changed course in more recent cases.

11

In 2010, Judge Stadtmueller of the Eastern District of Wisconsin noted that *Segall* was no longer good law in light of two recent decisions by the Wisconsin Court of Appeals. *Mirbeau*, 746 F. Supp. 2d at 1014 (citing *Turner v. Sanoski*, 2010 WI App 92, 327 Wis. 2d 503, 787 N.W.2d 429 (Ct. App. 2010) and *Stapel v. Stapel*, 2010 WI App 120, ¶ 34 n. 9, 2010 WL 2757237 (Ct. App. 2010)). In *Turner*, the state court of appeals found that continued reliance on *Segall* was misplaced for two reasons:

> First, it ignores the legislature's revision to WIS. STAT. § 893.57, which expanded the scope of claims subject to the two-year statute. Second, it fails to acknowledge that *Segall* applied the prior version of the statute. WISCONSIN STAT. § 893.57's predecessor prescribed a two-year statute of limitations for "[a]n action to recover damages for libel, slander, assault, battery, invasion of privacy or false imprisonment." WIS. STAT. § 893.21(2) (1977). However, in 1979, the legislature renumbered and amended the statute, adding to the list of claims, "or other intentional tort to the person." WIS. STAT. § 893.57. Furthermore, although we decided *Segall* in 1983, the case dealt with the 1977 version of the statute because the action there had accrued before the statute's revision. *Segall*'s interpretation of the statute of limitations has no applicability to the 1979 revised statute we are dealing with here.

> *Turner*, 2010 WI App 92 at ¶¶ 8–9.

Although *Turner* left open the question whether there was a specific statute of limitations controlling tortious interference with contract claims, the unpublished opinion in *Stapel* apparently resolved the issue, applying the two-year statute of limitations in § 893.57. *Mirbeau*, 746 F. Supp. 2d at 1014 (citing *Stapel*, 2010 WI App 120 at ¶ 34 n. 9).

Tilstra questions the validity of *Mirbeau* because it relies on an unpublished opinion that completely overlooked the decisions in *TSR* and *Elbe*. Tilstra has a point. Wisconsin only allows citations to unpublished opinions if they were issued after July 1, 2009 *and* are authored by a member of a three-judge panel; a per curiam opinion is not an authored opinion. § 809.23(b).

Although *Stapel* was issued after 2009, it was a per curiam opinion and therefore carries little weight.  *See Harnischfeger Corp. v. Harbor Insurance Co.*, 927 F.2d 974, 976 (7ᵗʰ Cir. 1991) ("A noncase for Wisconsin's own purposes is a non-case in federal courts under *Erie*.").  However, the court in *Mirbeau* did not limit its analysis to citing *Stapel*; the court correctly noted that *Turner* (a published opinion with precedential value) made clear that *Segall* no longer was good law in light of the revisions to the statute of limitations for intentional torts.

Tilstra points out that the court in *Turner* explained in dicta that a tort to the person is generally defined as an injury to one's person, reputation or feelings and *not* damage to real or personal property.  *Turner*, 327 Wis. 2d at 509-09.  Although Tilstra considers economic damages to the dealership to be akin to damage to real or personal property, that distinction is not necessarily clear in the case law.  The court in *Mirbeau* reviewed several Wisconsin Supreme Court decisions and concluded that that Court seemed to discard the words "to the person" in the statute and allowed § 893.57 to dictate the controlling limitations period for all intentional torts, even those of an economic nature.  *Id.* at 1015 (citing *Beloit Liquidating Trust v. Grade*, 2004 WI 39, 270 Wis. 2d 356, 677 N.W.2d 298 (2004) (breach of fiduciary duty); *Jones v. Secura Insurance Co.*, 2002 WI 11, ¶ 23, 249 Wis.2d 623, 638 N.W.2d 575 (2002) (insurer bad faith); *Warmka v. Hartland Cicero Mutual Insurance Co.*, 136 Wis.2d 31, 36, 400 N.W.2d 923 (1987) (same)).  In light of the more recent precedent and well reasoned opinions in *Turner* and *Mirbeau*, I conclude that § 893.57 governs Tilstra's claim for intentional interference with contract.

In a final argument, Tilstra contends that even if § 893.57 applies in this case, his timely filing of a lawsuit in Canada tolled the two-year statute of limitations from the date he filed suit,

November 14, 2011, until the Canadian court dismissed Bou-Matic as a party on May 21, 2013. Under § 893.13(2), a statute of limitations is tolled "by the commencement of the action to enforce the cause of action to which the period of limitation applies . . . for the period from the commencement of the action until the final disposition of the action." However, as Bou-Matic points out, it is subsection (3) of § 893.15 that specifically addresses the effect of an action filed in a non-Wisconsin forum:

> A Wisconsin law limiting the time for commencement of an action on a Wisconsin cause of action is tolled from the period of commencement of the action in a non-Wisconsin forum until the time of its final disposition in that forum.

Section 893.15(1) defines "a non-Wisconsin forum" as "all courts, state and federal, in states other than this state and federal courts in this state." As the Judicial Council Committee's note explains, "state" is defined in § 990.01(40) to include only the District of Columbia, Puerto Rico, and territories of the United States. Accordingly, "Subsection (3) applies the tolling effect of Wisconsin statutes to actions on Wisconsin causes of action brought in federal courts in Wisconsin and to all other courts, state and federal, *in the United States*." Judicial Council Committee's Note, § 893.15 (emphasis added). Because Tilstra did not file its previous lawsuit in the United States, that suit did not toll the statute of limitations in this case, which means the statute has run.[6]  Tilstra's tortious interference claim is time-barred.

---

[6] Although the parties have not discussed the issue, I note that the Court of Appeals for the Seventh Circuit has held that "a suit dismissed without prejudice is treated for statute of limitations purposes as if it had never been filed." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 923 (7th Cir. 2003) (citing *Elmore v. Henderson*, 227 F.3d 1009, 1011 (7th Cir. 2000)). It appears that the Canadian court dismissed Bou-Matic without prejudice to Tilstra refiling its claim in the correct forum. If that is the case, the Canadian lawsuit "is treated for statute of limitations purposes as if it had never been filed" and "the statute of limitations is deemed unaffected." *Elmore*, 227 F.3d at 1011. I also note that Tilstra did not argue that equitable tolling applies in this case, so I have not considered it.

### III.  Breach of Dealer Agreement

It is undisputed in this case that Ghey and Desjardins told Mr. and Mrs. Tilstra on November 16, 2009 that Bou-Matic was going to remove their entire trade territory if they did not agree to sell their assets and dealership to the Dortmans by January 1, 2010.  When negotiations between Tilstra and Dortmans stalled, Bou-Matic sent Tilstra a letter dated January 8, 2010, in which it stated that its "decision to change our distribution channel in South Western Ontario is not negotiable and . . . we will proceed with or without your cooperation." In an email to Dortmans that same day, Desjardins of Bou-Matic indicated that the deadline for Tilstra's sale to Dortmans was January 15, 2010.  Tilstra argues that Bou-Matic breached the dealership agreement because the January 8, 2010 letter: (1) breached the agreement's implied covenant of good faith and fair dealing; (2) terminated or at least constructively terminated Tilstra's dealership without good cause or the requisite 90-day notice; and (3) in the alternative, amounted to anticipatory repudiation of the agreement.

As an initial matter, Bou-Matic contends that because Tilstra did not plead the duty of good faith and fair dealing or anticipatory repudiation, those "claims" are waived and must be dismissed.  However, Fed. R. Civ. P. 8 requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Even though Tilstra's complaint fails to mention the terms "good faith and fair dealing" or "anticipatory breach," those concepts are legal theories related to Tilstra's allegations of breach of contract.  *See Zeidler v. A & W Restaurants, Inc.*, 301 F.3d 572, 575 (7th Cir. 2002) (covenant of good faith and fair dealing is only an aid to interpretation and not a source of contractual duties or liability); *United Vaccines, Inc. v. Diamond Animal Health, Inc.*, 2006 WL 6102590, *2 (W.D. Wis. July 26, 2006)

(referring to anticipatory breach of contract as legal theory); *Hauer v. Union State Bank of Wautoma*, 192 Wis. 2d 576, 597-98, 532 N.W.2d 456, 464 (Ct. App. 1995) (implied covenant "does not support an independent cause of action [from breach of contract] for failure to act in good faith under a contract"). The Court of Appeals for the Seventh Circuit has made clear that a "complaint need not identify a legal theory, and specifying an incorrect theory is not fatal." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992); *see also Hatmaker v. Memorial Medical Center*, 619 F.3d 741, 743 (7th Cir. 2010) ("plaintiffs in federal courts are not required to plead legal theories"). Because Tilstra's complaint properly notified Bou-Matic of all of the material facts underlying its claim of breach of contract, regardless of the legal theory, Tilstra did not waive any arguments related to the implied covenant or anticipatory breach.

### A. Good Faith and Fair Dealing

Bou-Matic contends that eliminating Tilstra's territory cannot be considered a breach because the dealership agreement gave it the sole discretion to change Tilstra's territory. Tilstra points out, however, that the agreement also provided that Bou-Matic could not terminate or effect a substantial change in the competitive circumstances of the dealership without good cause and 90-days notice. Tilstra contends that completely eliminating a dealer's territory is tantamount to a termination or at least a substantial change in competitive circumstances, and therefore, must be preceded by 90-days notice and predicated on good cause.

Wisconsin law recognizes that every contract imposes an obligation of good faith in its performance. *Estate of Chayka*, 47 Wis.2d 102, 107, 176 N.W.2d 561, 564 (1970). Although

"good faith" is difficult to define, Wisconsin courts have relied on the Restatement's definition of "bad faith":

> A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

*Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 541 N.W.2d 203, 213 (Ct. App. 1995) (quoting Restatement (Second) of Contracts § 205 comment d). A party may be liable for breach of the implied duty of good faith even though all the terms of the contract have been fulfilled. *Id.*, 197 Wis.2d at 796, 541 N.W.2d at 212. Under Wisconsin law, to state a claim for breach of the duty of good faith, a plaintiff must allege facts "that can support a conclusion that the party accused of bad faith has actually denied the benefit of the bargain originally intended by the parties." *Zenith Insurance Co. v. Employers Insurance*, 141 F.3d 300, 308 (7th Cir. 1998).

I agree with Tilstra that a jury reasonably could conclude that Bou-Matic evaded the spirit of the termination clause by eliminating all of Tilstra's territory without first providing it with its contractual right to a 90-day notice and a showing of good cause. Bou-Matic counters that it sought these changes in Tilstra's territory for good faith reasons, pointing to Tilstra's alleged poor service, failure to retain customers and lack of growth. However, Bou-Matic's intent and the validity of its reasoning are in dispute.[7] As a result, I find that there is a genuine

---

[7] Although the parties have not addressed explicitly whether Bou-Matic actually had good cause to terminate Tilstra's dealership, their proposed findings of fact indicate that the matter is disputed.

question of fact as to whether Bou-Matic breached the agreement's implied covenant of good faith and fair dealing.

### B. Termination

Bou-Matic argues that an actual breach did not occur because the January 8, 2010 letter referred only to *future* changes and did not result in the actual removal of Tilstra's territory before Tilstra self-terminated the agreement.  In support of its argument, Bou-Matic points out that Tilstra would not have remained as a dealer through March 2010 had his territory been reassigned because he would have risked being terminated a second time.

Although it is technically correct to note that the letter refers to future deadlines and events, it is eminently reasonable to infer from the letter's language and surrounding circumstances that it was not an idle threat, a bluff that Tilstra was obliged to call.  The letter confirmed that Bou-Matic had made the decision to remove Tilstra's territory and that the decision was non-negotiable.  Bou-Matic also stated that it would proceed with the changes regardless whether Tilstra cooperated by selling to Dortmans.  True, Tilstra continued to operate the dealership for a brief time after the deadline while the lawyers finalized the paperwork; while Bou-Matic can tout this as evidence showing lack of actual termination, it certainly is not dispositive of the question.  Tilstra stopped functioning as Bou-Matic's dealer as soon as the sale was finalized, and explains that it kept the doors open until then so that Bou-Matic could not accuse Tilstra of abandoning the agreement before the sale was finalized.  As a result, it is for the jury to determine whether Bou-Matic's actions rose to the level of termination or a substantial change in Tilstra's competitive circumstances.

In the alternative, Tilstra contends that even if Bou-Matic's actions did not actually terminate the agreement, then they at least amounted to an anticipatory or constructive termination.  Bou-Matic argues that neither theory applies in this case.

### 1.  Anticipatory Breach

Anticipatory breach is "the disclaimer of a contractual duty . . . even if the time specified in the contract for performing the duty has not yet arrived."  *Wisconsin Power & Light Co. v. Century Indem. Co.*, 130 F.3d 787, 793 (7th Cir. 1997).  "In other words, anticipatory repudiation (sometimes called anticipatory breach) is conceived of primarily as a trigger of a contract party's right of self-help, like the breach of a condition in a contract."  *Central States, Southeast & Southwest Areas Pension Fund v. Basic American Indus., Inc.*, 252 F.3d 911, 915 (7th Cir. 2001).  In order to constitute an anticipatory repudiation of a contract, there must be a definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives.  *Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 854 (7th Cir. 2005) (citing *Wisconsin Dairy Fresh, Inc. v. Steel & Tube Products Co.*, 20 Wis. 2d 415, 122 N.W.2d 361, 367 (1963)).  "Doubtful and indefinite statements that performance may or may not take place and statements that, under certain circumstances that in fact do not yet exist, the performance will not take place, are not held to create an immediate right of action."  *Wisconsin Dairy Fresh*, 20 Wis. 2d at 427.  Finally, Wisconsin also requires that "the non-breaching party must treat the breaching party's conduct as a breach, because if the non-breaching party continues to demand performance, the contract is kept alive for the benefit of both parties."  *Bank One Milwaukee, N/A v. Williams Bay Trading*

*Co., Ltd.*, 2000 WI App 256, ¶ 26, 239 Wis. 2d 593, 620 N.W.2d 482 (citing *Woodman v. Blue Grass Land Co.*, 125 Wis. 489, 495, 103 N.W. 236 (1905)).

As explained above, one reasonable conclusion that can be drawn from the facts of record is that Bou-Matic had decided to end Tilstra's dealership and would not be providing Tilstra with either a 90-day notice or an explanation of good cause, regardless whether Tilstra worked out a sales agreement with Dortmans.  Bou-Matic argues that Tilstra failed to treat the January letter as a breach because Tilstra continued operating under the dealership agreement until March 2010.  However, as discussed above, Tilstra *did* take action:  Sid Tilstra says that he sold his business to Dortmans at a lower price than he wanted in order to cut his losses, and he ceased his performance under the agreement upon completion of this sale.  Under these circumstances, the fact that Tilstra kept operating as a Bou-Matic dealer for two months after the alleged repudiation—in order, Tilstra claims, to avoid giving Bou-Matic more ammunition to use against it—does not necessarily preclude him from arguing anticipatory breach.

### 2.  Constructive termination

The idea of constructive termination usually arises cases brought under the Wisconsin Fair Dealership Law (WFDL).  *See Girl Scouts of Manitou Council Inc. v. Girl Scouts of the United States of America Inc.*, 700 F. Supp. 2d 1055, 1079 (E.D. Wis. 2010), *rev'd in part on other grounds*, 646 F.3d 983 (7th Cir. 2011); *JPM, Inc. v. John Deere Indus. Equip. Co.*, 934 F. Supp. 1043, 1045 (W.D. Wis. 1995), *aff'd*, 94 F.3d 270 (7th Cir. 1996).  State and federal courts also recognize a theory of constructive discharge in the field of employment law.  *Mac's Shell Service, Inc. v. Shell Oil Products Co. LLC*, 559 U.S. 175, 184 (2010) (citing *Pennsylvania State Police v. Suders*, 542

U.S. 129, 141–143 (2004) (tracing the doctrine to the 1930's); *Beidel v. Sideline Software, Inc.*, 2013 WI 56, ¶ 40, 842 N.W.2d 240, 254.  As generally understood in these contexts, a termination is deemed "constructive" because it is the plaintiff rather than the defendant who formally puts an end to the particular legal relationship, not because there has been no actual end to the relationship.  *Mac's Shell Service*, 559 U.S. at 185.

Although the WFDL does not apply in this case, both parties have applied the constructive termination doctrine by analogy to Tilstra's common law claim for breach of contract.  However, neither Tilstra nor Bou-Matic cites any authority for applying the doctrine to a straight-up breach of contract claim.  I have not found a Wisconsin case that is directly on point.

In applying the WFDL, the Seventh Circuit has explained that

> The provision about not "substantially chang[ing] the competitive circumstances of the dealership" may be intended simply to protect the dealer against "constructive termination," that is, against the franchisor's making the dealer's competitive circumstances so desperate that the dealer "voluntarily" gives up the franchise. Constructive termination is a problem in some employee tenure cases, where it is treated, as it should be, as termination. *See, e.g., Parrett v. City of Connersville*, 737 F.2d 690, 694 (7th Cir. 1984). The Wisconsin Fair Dealership Law makes the equation explicit. Not only may the franchisor not terminate or fail to renew the franchise outright; the franchisor may not drive the dealer out of business-say by doubling the wholesale price to him only, so that he cannot complete against other dealers in the same product.

*Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1240 (7th Cir. 1986).

Although the parties are not subject to the statutory provision about not "substantially changing the competitive circumstances of the dealership," they included this term in their dealership agreement, which suggests an agreement to protect Tilstra from constructive

discharge.  If this is the case, then a reasonable jury could conclude that Bou-Matic's unilateral decision to completely remove Tilstra's entire territory all at once could constitute constructive termination because–obviously–it substantially changed Tilstra's competitive circumstances.  *See Conrad's Sentry, Inc. v. Supervalu, Inc.*, 357 F. Supp. 2d 1086, 1099 (W.D. Wis. 2005) (interpreting *Remus* as requiring plaintiff to show evidence that defendant made change in competitive circumstances that had discriminatory effect on plaintiff or that defendant's actions were intended to eliminate plaintiff as dealer to prove constructive termination); *Girl Scouts*, 700 F. Supp. 2d at 1079 (constructive termination can occur when grantor takes actions that amount to "effective end to the commercially meaningful aspects of the . . . relationship").

Bou-Matic argues, however, that "there is insufficient evidence to sustain a claim of constructive termination" because Tilstra cannot show that he was under economic duress when he sold his business to Dortmans.  Dkt. 35 at 27.  Most jurisdictions, including Wisconsin, recognize economic duress as a contractual defense or a basis for rescinding a contract.  28 *Williston on Contracts*, § 71.7 at 447.  In Wisconsin, these are the elements of economic duress: (1) the party alleging economic duress must show that he has been the victim of a wrongful or unlawful act or threat; (2) such act or threat must be one which deprives the victim of his unfettered will; (3) as a direct result of these elements, the party threatened must be compelled to make a disproportionate exchange of values or to give up something for nothing; and (4) the party threatened must have no adequate legal remedy.  *Wurtz v. Fleischman*, 97 Wis. 2d 100, 109-10, 293 N.W.2d 155, 160 (1980).  Although Bou-Matic contends that Tilstra cannot establish any of these elements, its most persuasive argument is that Tilstra could have chosen not to sell his business and sought a preliminary injunction or sued for breach of contract.

22

Economic duress generally serves as a defense to liability, such as when a party claims that a contract was invalid because it was formed under duress. *Girl Scouts*, 700 F. Supp. 2d at 1102 (quoting *Colortyme, Inc. v. Are Not, Inc.*, 2004 WL 848192, at *1 (W.D. Wis. Apr. 13, 2004)); *Pope v. Ziegler*, 127 Wis. 2d 56, 60, 377 N.W.2d 201, 203 (Ct. App. 1985). In addition, both this court and the Seventh Circuit have held that economic duress can serve as the basis of a constructive termination claim under the Wisconsin Fair Dealership Law. *JPM*, 94 F.3d at 272; *JPM*, 934 F. Supp. at 1045. However, Tilstra has not based his constructive termination claim on economic duress, it has not asserted economic duress as a defense to liability, and it has not claimed that the agreement was invalid because of economic duress. Although Bou-Matic seems to be asserting that economic duress is a necessary element of a constructive termination claim, it cites no authority for such a proposition, and the holdings in *Remus* and *Conrad's Sentry* indicate that this is not the case. Without more, I cannot find that Tilstra is precluded from proceeding on a theory of constructive termination. Put the other way, Tilstra's claim of constructive termination survives summary judgment.

### D. Estoppel

Bou-Matic's final argument for summary judgment is that Tilstra is estopped from complaining about termination because Tilstra voluntarily sold its dealership without objection, thus relieving Bou-Matic of its contractual obligation to establish good cause and provide notice.

Equitable estoppel is (1) action or non-action, (2) on the part of one against whom estoppel is asserted, (3) which induces reasonable reliance thereon by the other, either in action or non-action, and (4) which is to his or her detriment. *Milas v. Labor Ass'n of Wisconsin, Inc.*,

214 Wis. 2d 1, 11-12, 571 N.W.2d 656, 660 (1997).  In this case, there are genuine questions whether Bou-Matic already had terminated, had anticipatorily repudiated or had constructively terminated the agreement before Sid Tilstra sold his dealership to Dortmans.  If the answer to any of these questions is "Yes," then Bou-Matic would not be entitled to rely on equitable estoppel to bar Tilstra's claim. *Security Pacific National Bank v. Ginkowski*, 140 Wis. 2d 332, 339, 410 N.W.2d 589, 593 (Ct. App. 1987) (unclean hands doctrine bars equitable relief when party's own wrongful conduct caused the harm from which party seeks relief).


ORDER

IT IS ORDERED that defendant Bou-Matic LLC's motion for summary judgment, dkt. 18, is:

(1) GRANTED as to plaintiffs Sid Tilstra's and Tilstra Dairy Equipment, Ltd.'s claim for tortious interference with contract.  That claim is DISMISSED as barred by the statute of limitations; and

(2) DENIED as to plaintiffs' claim for breach of contract.


Entered this 4th day of March, 2014.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge