IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SID TILSTRA and
TILSTRA DAIRY EQUIPMENT, LTD.,

OPINION AND ORDER

12-cv-827-slc

Plaintiffs,

v.

BOU-MATIC, LLC,

Defendant.

Following a four-day trial in this civil lawsuit related to a dairy equipment dealership agreement between the parties, the jury found that defendant Bou-Matic, LLC had breached the implied duty of good faith and fair dealing in the agreement and awarded plaintiff Tilstra Dairy Equipment, Ltd. $471,124 in damages. Because the jury determined that Bou-Matic breached its duty of good faith by constructively terminating the dealership agreement, the jury did not reach the special verdict question asking whether Bou-Matic's actions constituted anticipatory repudiation. During the trial, Bou-Matic moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which the court denied orally. *See* dkts. 140-41. Now Bou-Matic has renewed its motion for judgment as a matter of law (JMOL) under Fed. R. Civ. P. 50(b) on liability and damages, dkt. 131, filed a fall-back Rule 59(a) motion for a new trial, dkt. 132, and filed a Rule 59(e) motion to alter or amend the judgment to reduce the damages award (or remittitur), dkt. 130.

Bou-Matic has filed a lengthy, scattershot brief in support of its post-verdict motions that challenges the jury's findings, reiterates the arguments that Bou-Matic made on summary

judgment, and posts a laundry list of complaints about how the court handled this lawsuit. Some of these complaints do not appear to be the subject of Bou-Matic's motions.[1]

Although Bou-Matic's brief is difficult to decipher, the court has discerned seven core arguments: (1) there was insufficient evidence to support a finding that Bou-Matic breached its implied duty of good faith or constructively terminated the dealership agreement with Tilstra; (2) there was insufficient evidence of anticipatory repudiation; (3) Tilstra did not establish a claim of economic duress; (4) the parties' agreement specifically precluded damages for a loss of goodwill in the event of a termination; (5) the court erroneously allowed Tilstra's damages expert to testify; (6) plaintiff failed to mitigate its alleged damages; and (7) Tilstra's counsel made a number of improper and prejudicial statements during closing arguments.

For the reasons explained below, I am denying Bou-Matic's motions because the issues raised either lack merit or have been rejected by the court for the reasons provided in previous rulings in this case. The facts of this case have already been recounted in detail in the court's order granting in part and denying in part defendants' motion for partial summary judgment. Dkt. 45.

---

[1] For example, in the section of its brief entitled "Procedural History," Bou-Matic discusses how the special verdict form and jury instructions were a moving target, but it fails to develop any argument about how it was prejudiced by such changes. It should go without saying that ongoing tailoring of the instructions is common practice federal court. Not only does common sense suggest that courts modify the instructions to fit the evidence actually presented, Fed. R. Civ. P. 51 *entitles* the parties to offer instructions and modifications of the instructions at and after the close of the evidence.

OPINION

I. **Applicable Legal Standard**s

Fed. R. Civ. P. 50 allows a district court to enter judgment against a party who has been fully heard on an issue during a jury trial if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012) (citing Rule 50(a)). In deciding a Rule 50(b) renewed motion for JMOL, the court construes the facts strictly in favor of the party that prevailed at trial while disregarding all evidence favorable to the moving party that the jury is not required to believe. *May v. Chrysler Group, LLC*, 716 F.3d 963, 971 (7th Cir. 2013). The court does not make credibility determinations or weigh the evidence; it simply determines whether "more than 'a mere scintilla of evidence' supports the verdict." *Id.* (quoting *Hossack v. Floor Covering Assoc. of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2007)).

In other words, the court's "job is to decide whether a highly charitable assessment of the evidence supports the jury's verdict or if, instead, the jury was irrational to reach its conclusion." *Id.* "[T]he question is not whether the jury believed the right people, but only whether it was presented with a legally sufficient amount of evidence from which it could reasonably derive its verdict." *Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922, 924 (7th Cir. 2000) (also noting court may not assess credibility or persuasiveness of witnesses). If the moving party demonstrates that "the jury's findings, presumed or express, are not supported by substantial evidence, or if they were, that the legal conclusions implied from the jury's verdict cannot in law be supported by those findings," then the verdict should be set aside. *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1358 (Fed. Cir. 1998).

3

Rule 59(a) is more lenient: it allows a court to order a new trial if "the verdict is against the clear weight of the evidence or the trial was unfair to the moving party." *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (internal quotation marks and citation omitted); *David v. Caterpillar*, 324 F.3d 851, 863 (7th Cir. 2003). Unlike a Rule 50 motion, a court considering a motion for a new trial "has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook County*, 650 F.3d 631, 633 (7th Cir. 2011). There is no requirement that the court view the evidence in a light most favorable to the non-moving party. *Id.* at 634. "A new trial should be granted, however, 'only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.'" *Whitehead v. Bond*, 680 F.3d 919, 927-28 (7th Cir. 2012) (quoting *Clarett*, 657 F.3d at 674). The court should allow the jury's verdict to stand if "a reasonable basis exists in the record to support the verdict, viewing the evidence in the light most favorable to the prevailing party, and leaving issues of credibility and weight of evidence to the jury." *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004).

## II. Duty of Good Faith and Constructive Termination

Bou-Matic contends that it was not possible for it to breach its implied duty to act good faith because the parties' agreement expressly allowed Bou-Matic either to terminate the contract under certain conditions and to alter Tilstra's territory at Bou-Matic's sole discretion. This has been Bou-Matic's mantra throughout this lawsuit. Here's the Achilles' Heel in Bou-Matic's argument: the agreement's termination clause *further* provided that Bou-Matic could not

4

terminate the agreement or effect a substantial change in the competitive circumstances of the agreement without 90-days notice and good cause. As I noted in rejecting the same argument on summary judgment, the jury could–and *did*–reasonably conclude that Bou-Matic had evaded the spirit of the termination clause by deciding to eliminate *all* of Tilstra's territory without first providing Tilstra with the required 90-day notice and a showing of good cause. *See* Mar. 4, 2014 Ord., dkt. 45 at 16-17 (citing *Zenith Insurance Co. v. Employers Insurance*, 141 F.3d 300, 308 (7th Cir. 1998) (bad faith occurs when plaintiff "actually denied the benefit of the bargain originally intended by the parties"); *Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 796, 541 N.W.2d 203, 213 (Ct. App. 1995) (citing Restatement (Second) of Contracts § 205 comment d) (breach of duty may include evading spirit of bargain or interfering with other party's performance, even though defendant technically may have fulfilled all contract terms)).

      Bou-Matic argues that it only *threatened* to eliminate Tilstra's territory on some future, unspecified date and that it did not take any action that injured or destroyed Tilstra's contractual rights or the "competitive circumstances" of the agreement. Bou-Matic points out that Tilstra still was able to use Bou-Matic's trademarks and hold itself out as a Bou-Matic dealer—at least until Tilstra ended that relationship by selling his dealership to the Dortmans in March 2010. However, as previously explained by this court on summary judgment and during trial, Tilstra claimed that Bou-Matic constructively terminated the dealership by effectively putting an end to the commercially meaningful aspects of the parties' contractual relationship. *See Remus v. Amoco Oil Co.,* 794 F.2d 1238, 1240 (7th Cir. 1986) (noting constructive termination in WFDL cases is where franchisor makes dealer's competitive circumstances so desperate that dealer "voluntarily" gives up franchise); *Girl Scouts of Manitou*

*Council Inc. v. Girl Scouts of the United States of America Inc.*, 700 F. Supp. 2d 1055, 1079 (E.D. Wis. 2010), *rev'd in part on other grounds*, 646 F.3d 983 (7th Cir. 2011) (constructive termination can occur when grantor takes actions that amount to "effective end to the commercially meaningful aspects of the . . . relationship"); *Conrad's Sentry, Inc. v. Supervalu, Inc.*, 357 F. Supp. 2d 1086, 1099 (W.D. Wis. 2005) (plaintiff can prove constructive termination by showing defendant made change in competitive circumstances that had discriminatory effect on plaintiff or that defendant's actions were intended to eliminate plaintiff as dealer).

At trial, Tilstra adduced evidence that Dan Bradbury from Bou-Matic emailed and posted a letter to Sid Tilstra on January 8, 2010, stating:

> We met back on November 16th, 2009 to inform you that BouMatic LLC decided to make distribution changes in South Western Ontario and have Dortmans Brothers take over the territory covered by your company. At that time we also mentioned that we were seeking a tentative deal by December 1st 2009 for an official take over date of January 1st 2010.
>
> \*   \*   \*
>
> We have to make you aware that our decision to change our distribution channel in South Western Ontario is not negotiable and that we will proceed with or without your cooperation.

Tr. Exh. 15, dkt. 133, Exh. 1 at 7-8.

Although the letter does not state an exact date set for Bou-Matic's removal of Tilstra's territory, the jury reasonably could infer from its content that the decision to reassign Tilstra's territory to Tilstra's local competitor was final and would occur in January 2010 when the sale went through. Further, Evelyn Tilstra testified that on November 16, 2009, Jon Ghey and Stephane Desjardins told her and her husband that "[y]ou will no longer be a Bou-Matic dealer and you will not receive any more product." Dkt. 122 at 48. Sid Tilstra corroborated this and testified

that he understood from this November 16 meeting and the January 8 letter that this removal and reassignment was imminent. *Id.* at 5-6. From this evidence, the jury reasonably could conclude that Bou-Matic's threats were genuine and were intended to eliminate Tilstra as a dealer by putting unbearable pressure on him to sell to Dortmans.

Bou-Matic claims that it would have issued a 90-day termination letter identifying good cause if Tilstra had not sold its dealership to Dortmans as directed. However, regardless what Bou-Matic *could* have done if its threats had been unavailing, Bou-Matic did not to issue a 90-day termination letter in which it provided its claims of good cause. Further, in its communications with Tilstra, Bou-Matic failed to cite any failure on Tilstra's part that would have constituted good cause.

Bou-Matic argues, as it did at trial, that removal of Tilstra's territory did not change the competitive circumstances of the agreement because a customer could buy from anyone, even a person without a territory. There was, however, countervailing evidence adduced at trial that having an assigned territory was important to dealers so that they could maintain a customer base and remain commercially viable. For example, John Dortmans testified that the purpose of having territories was so that a dealer knew which farmers it could service. Depo. of John Dortmans at pp. 34-5, dkt. 115 at 10. Under such circumstances, the jury had a sufficient basis to conclude that the removal of Tilstra's territory would bring the commercially meaningful aspects of the dealership agreement to an end.

Related to Bou-Matic's above arguments are its criticisms of the following jury instruction that the court gave regarding constructive termination:

> **Constructive Termination**
>
> Plaintiff alleges that defendant breached the implied covenant of good faith in this case by constructively terminating his dealership agreement. A constructive termination of a dealership agreement occurs when the grantor of the dealership-here, the defendant-takes actions that amount to an effective end to the commercially meaningful aspects of the dealership agreement, regardless whether the formal contractual relationship set forth in the dealership agreement between the parties continues in force.

Dkt. 108 at 4.

As Tilstra notes, however, Bou-Matic has not developed a coherent argument with respect to this instruction, and an undeveloped argument is waived. *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (undeveloped argument regarding failure to provide limiting instruction considered waived). True, Bou-Matic's brief included a section heading entitled "Boumatic entitled to a new trial due to . . . the erroneous constructive termination instruction," dkt. 133 at 49. But Bou-Matic does not address this issue in the argument that follows. Bout-Matic further fails to mention this instruction in the "Summary of Argument" section of its brief, dkt. 133 at 4-8. Instead, scattered throughout Bou-Matic's brief are potshots and conclusory arguments related to the jury instruction on constructive termination. As a result, Bou-Matic has forfeited its challenge with respect to the constructive termination instruction.

In any event, even if Bou-Matic had raised a coherent challenge to this jury instruction, its arguments would have been meritless. Bou-Matic seems to take issue with the fact that the termination provision in the parties' agreement precludes changes in the "competitive circumstances of the agreement" without good cause, whereas the jury instruction states that constructive termination occurs when the defendant takes action that amounts to an end of the "commercially meaningful aspects" of the agreement. According to Bou-Matic, the instruction expands the scope of the parties' contractual relationship. However, it is unclear why Bou-Matic believes that this is the case. As the court explained at the jury instruction conference, under the facts of this case, a breach of the duty of good faith and constructive termination are two sides of the same coin. Dkt. 127 at 32-33. What made Tilstra's dealership both competitive and commercially meaningful was its territory; without it, Tilstra's dealership effectively would come to an end.

### III. Anticipatory Repudiation

Because I have found that there is sufficient evidence to support the jury's verdict with respect to breach of the implied covenant of good faith, the jury properly did not reach the special verdict question related to anticipatory repudiation. As a result, it is unnecessary to address Bou-Matic's arguments related to the sufficiency of the evidence on this issue. Frankly, it's not only unnecessary, it's impossible: because the jury never answered this verdict question, no one has any idea what its answer might have been.

**V. Economic Duress**

Bou-Matic renews the argument it raised on summary judgment that Tilstra's choice to sell his business cannot constitute constructive termination without evidence of economic duress. *See* dkts. 45 at 22-23 and 140 at 4-5. Bou-Matic assumes that Tilstra had to prove economic duress because Sid Tilstra said that Bou-Matic "forced" him to sell his business. However, as explained in the summary judgment order, that doctrine generally serves as a *defense* to liability, such as when a defendant seeks to invalidate a contract because it was formed under duress. *See* dkt. 45 at 21-3 (citing *Girl Scouts*, 700 F. Supp. 2d at 1102 (quoting *Colortyme, Inc. v. Are Not, Inc.*, 2004 WL 848192, at *1 (W.D. Wis. Apr. 13, 2004)); *Pope v. Ziegler*, 127 Wis. 2d 56, 60, 377 N.W.2d 201, 203 (Ct. App. 1985)). Bou-Matic has not cited any authority requiring Tilstra to prove the elements of economic duress in order to show that Bou-Matic constructively terminated the agreement. Tilstra's claim is that Bou-Matic constructively terminated the dealership by making the decision to remove his territory. The fact that Tilstra chose to cut its losses and sell before Bou-Matic effected the territory removal does not change the fact that Bou-Matic violated its duty to act in good faith.

Related to this issue is Bou-Matic's argument that Tilstra should not have been allowed to argue that he had no choice but to sell his business because his assumption that Bou-Matic would not follow the terms of the agreement does not constitute compulsion. Dkt. 133 at 45-7. Whether or not the Tilstras felt compelled to sell and for what price was a decision that the jury was entitled to make based on the testimony of the witnesses. The jury chose to believe Tilstra. The evidence was relevant to whether Bou-Matic constructively terminated the dealership agreement and breached its implied duty of good faith. Bou-Matic contends that it could not

have forced plaintiff to sell because it did not hold title to any of plaintiff's assets or goodwill. However, as discussed above, the jury reasonably could conclude from the evidence it heard that Bou-Matic had the power to end Tilstra's dealership and mortally wound his business by removing all of Tilstra's territory.

## V. Entitlement to Damages for Loss of Goodwill

Bou-Matic contends that Tilstra was not entitled to recover damages for the loss of goodwill because such damages are expressly excluded in paragraph 14 of the agreement, which states in relevant part:

> TERMINATION OF DEALERSHIP AGREEMENT. Dealer may terminate this Agreement at any time for any reason by simply notifying Bou-Matic in writing as to the date Dealer wishes it terminated. Except as otherwise provided herein, Bou-Matic shall not terminate this Agreement or effect a substantial change in the competitive circumstances of this Agreement without good cause and only upon at least ninety (90) days' advance written notice sent by certified mail. . . . Regardless of which party terminates this Agreement, Dealer shall not be entitled to any termination compensation or to any compensation for goodwill. . .

Bou-Matic cites numerous decisions holding that a plaintiff's remedies may be limited when the contract expressly excludes damages in the event of breach. *See* dkt. 133 at 31-2 (summarizing cases). The above contract provision, however, expressly excludes compensation for goodwill only upon proper termination of the dealership agreement—in other words, when and if Bou-Matic provided 90-day written notice and good cause. Unlike the contract provisions in many of the cases cited by Bou-Matic, paragraph 14 applies only to the proper *termination* of the agreement; it says nothing about cases in which a *breach* occurs. *See, e.g., United Vaccines, Inc. v. Diamond Animal Health, Inc.*, 409 F. Supp. 2d 1083, 1097 (W.D. Wis. 2006) (plaintiff precluded

from obtaining damages for lost sales and customers where contract provided that neither party shall be liable for such damages "however caused, arising under any theory of liability"). The paragraph is entitled "Termination" and says nothing about generally limiting damages regardless of the type of liability alleged. Because the jury determined that Bou-Matic *breached* its duty of good faith, at least in part by evading the requirements of paragraph 14, Tilstra was entitled to seek damages for a loss of goodwill.

## VI. Testimony by Plaintiff's Expert Witness

Bou-Matic next argues that even if Tilstra was entitled to recover for lost goodwill, the court should have struck the testimony of Tilstra's damages expert, Robert Scianella, because it was unreliable under Fed. R. Evid. 702 or *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 592-93. Before trial, Bou-Matic filed a motion in limine challenging Scianella's report on the grounds that Scianella had not performed a market study of present or future market conditions and had failed to consider that Bou-Matic had to approve all dealership transfers and had the sole discretion to change the size of a dealer territory. Dkts. 53-4. According to Bou-Matic, Scianella should have based his calculations on a restricted market, not an unrestricted market.

I denied the motion in limine at the final pretrial conference on April 30, 2014, finding that the report did not violate *Daubert* and that Bou-Matic's arguments were fodder for cross examination at trial. Dkt. 126 at 3-4. *See also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Bou-Matic reiterates its previous arguments in various forms in his post-verdict motions,

contending that Scianella's opinion was flawed because he failed to consider important market factors, did not rely on any comparable sales, and made incorrect assumptions about the viability of Tilstra's dealership.

The court's position has not changed post-trial. Scianella's opinions were not unreliable. They were admissible. Scianella used the capitalized earnings method to estimate the fair market value of Tilstra. In reaching his conclusions, he considered the economic and industry outlook for Tilstra, the dairy farm equipment market and the financial health of Tilstra's business. Although Bou-Matic proffers a laundry list of factors that it contends Scianella should have considered, these factors all affect the weight to be given to Scianella's testimony, not its admissibility. Such variables might make Scianella's calculations more or less relevant to the actual value of Tilstra, but they do not mean that Scianella used an improper or unreliable method to calculate the result he reached. *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000) ("Our case law has recognized that experts in various fields may rely properly on a wide variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion."); *Matthews v. Waukesha Cnty.*, 937 F. Supp. 2d 975, 986 (E.D. Wis. 2013) (court's focus is whether opinion based on reliable method, not on method defendants deem to be most reliable). Because Bou-Matic has not shown that a reliable valuation of a dealership necessarily *must* include all of the factors it identifies, the jury was entitled to credit Scianella's testimony.

**VII. Plaintiff's Closing Argument**

Bou-Matic provides another laundry list, this time proffering statements made by Tilstra's lawyer during closing argument that Bou-Matic contends were improper and may have prejudiced Bou-Matic. Bou-Matic complains that plaintiff's counsel:

1. Stated without any evidentiary basis that Bou-Matic could alter a territory if a new highway came in.

2. Claimed that taking away an entire territory was bad faith and repudiated the contract when the contract expressly allowed Bou-Matic to make changes to the territory.

3. Stated incorrectly that a proposed change could be a constructive termination of the contract.

4. Argued that Bou-Matic failed to give Tilstra notice and violated the termination provision when Tilstra was never even terminated.

5. Misquoted the October 26, 2009 email from Desjardins to Ghey as stating "I've got a great idea" instead of "I have an idea to share with you" and falsely claimed the email was communicated to Tilstra on November 16, 2009.

6. Falsely stated that Tilstra's territory would have been taken away within a matter of weeks when there was no evidence to this effect or any date certain on which the territory would be removed.

7. Falsely claimed the January 8, 2010 letter stated "You are done."

8. Improperly stated that Tilstra's business was generating $400,000 to $500,000 when Tilstra never made more than $421,499 a year.

9. Manipulated the goodwill damages instruction by telling the jury that it had to award goodwill even though the contract said that the parties could not recover for loss of goodwill. Bou-Matic also argues counsel told the jury that the court had ruled that the goodwill clause was unenforceable.

10. Caused the jury to award lost future profits in addition to goodwill by stating that had Tilstra remained a dealer, he would have been making good money.

Bou-Matic's first nine complaints reiterate its earlier arguments about the sufficiency of the evidence and the court's purportedly erroneous rulings, which I have addressed above. Many

14

of these complaints amount to nothing more than quibbling over how Attorney Antoniewicz chose to characterize the evidence, which is entirely his prerogative. *See Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 731 (7th Cir. 1999). Even if plaintiff's counsel were to have incorrectly paraphrased some of the evidence, this did not amount to clear error or unfair prejudice to Bou-Matic. The Seventh Circuit has repeatedly explained that "improper comments during closing argument rarely rise to the level of reversible error." *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008) (citations omitted). To constitute reversible error and warrant a new trial, statements made during closing argument must be "plainly unwarranted and clearly injurious." *Jones,*, 188 F.3d at 730. None of the statements cited by Bou-Matic cross this threshold.

Further, I reject Bou-Matic's assertion that Attorney Antoniewicz encouraged the jury to award lost future profits in addition to goodwill by referring to how well Tilstra had done in the past and the business he stood to lose. As Tilstra points out, Antoniewicz made that statement when referring to the analysis of the loss of goodwill and made clear to the jury that Tilstra's profits had been factored in to the goodwill analysis. In addition, the jury instructions made clear that Tilstra was seeking damages for the loss of goodwill.

## VIII. Failure to Mitigate Damages

Bou-Matic makes a number of statements throughout its brief about the lack of evidence supporting the damages verdict and about the damages verdict being too high. However, apart from challenging the reliability of Scianella's report and statements made by Tilstra's attorney during closing argument, the only other argument that Bou-Matic has developed is that Tilstra should have mitigated its damages by *not* selling, because if the Tilstras had sat back and done *nothing*, then they would have suffered no damages. This is merely Bou-Matic's version of events.

The jury chose not to accept it, instead finding that the Tilstras felt they had no choice but to cut their losses because Bou-Matic was removing their territory and effectively putting an end to the Tilstra dealership. Bou-Matic's argument is nothing more than a rehash of its earlier arguments with respect to constructive termination and economic duress, which I have rejected for the reasons stated above.

## ORDER

IT IS ORDERED that defendant Bou-Matic LLC's renewed motion for judgment as a matter of law, dkt. 131, alternative motion for a new trial, dkt. 132, and alternative motion to alter or amend the judgment, dkt. 130, all are DENIED.

Entered this 19th day of September, 2014.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge